IN THE UNITED STATES DISTRICT COURT
NORTHISN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LANA MARIE RASTETTER, | ) | CASE NO.  5:22CV1808 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| vs. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

Plaintiff, Lana Marie Rastetter, ("Plaintiff" or "Rastetter"), challenges the final decision of Defendant, Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act,42 U.S.C. §§ 416(i), 423, 1381 et seq. ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.   PROCEDURAL HISTORY

In January 2020, Rastetter filed an application for SSI, alleging a disability onset date of March 23, 2017, and claiming she was disabled due to chronic obstructive pulmonary disease (COPD), respiratory problems, knee problems, and vision problems. Transcript ("Tr.") at 72-73, 204. Her application was denied initially and upon reconsideration, and Rastetter requested a hearing before an administrative law judge ("ALJ").  (Tr. 72, 79, 104 )

1

In May 2021, ALJ Amanda Knapp held a hearing on Rastetter's application. (Tr. 37-71) Rastetter, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On September 27, 2021, the ALJ issued a written decision finding Rastetter was not disabled. (Tr. 20-32) The ALJ's decision became final on August 16, 2022, when the Appeals Council declined further review. (Tr. 1-9).

Rastetter then filed the instant Complaint challenging the Commissioner's final decision. (Doc. No. 1)  The parties have completed briefing in this case. (Doc. Nos. 7-9) In her brief, Rastetter asserts the following assignments of error:

1.  The ALJ's RFC determination is unsupported by substantial evidence as she failed to properly evaluate the opinion of Heather Frischkorn, NP-C.

2.  The ALJ's RFC determination is unsupported by substantial evidence as she failed to accommodate any limitation for Plaintiff's severe bilateral knee impairment.

(Doc. No. 7 at 8-15)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Rastetter was born in 1969 and was 50 years-old on the date the application was filed making her an "individual closely approaching advanced age," under social security regulations.  (Tr. 15) *See* 20 C.F.R. § 416.963.  She has a limited education and is able to communicate in English.  (*Id.*) She has no past relevant work. (*Id.*)

### B.    Relevant Medical Evidence

#### *Chronic Obstructive Pulmonary Disease ("COPD")*

In March 2018, following a trip to the emergency room where Rastetter was diagnosed with COPD, bronchitis, and spams, Rastetter established care with Heather Frischkorn, NP. (Tr. 701) It was noted Rastetter did not have a primary care physician prior to this visit, but she previously

sought treatment in the ER or "stat care." (*Id.*) Rastetter stated she had been experiencing dyspnea with minimal exertion over the last several months. (*Id.*) She reported trying an albuterol inhaler, a humidifier, and OTC Robitussin DM without relief. (*Id.*) On examination, Rastetter displayed rhonchi on the right lung and diminished breathing sounds throughout. (*Id.*) NP Frischkorn also administered a six-minute walk test that recorded Rastetter's oxygen saturation rate (spo2) at a 97% at rest and a 94% after the six-minute walk. (*Id.*) NP Frischkorn started Rastetter on steroid tablets (Prednisone), a maintenance inhaler (Breo), and antibiotics (Zithromax). (Tr. 702)

In April 2018, NP Frischkorn stated that pulmonary function tests "did not reveal any abnormalities," though Frischkorn questioned whether use of steroids and antibiotics may have skewed the test results. (Tr. 699) Rastetter stated she was "doing well." (*Id.*) She reported shortness of breath with exertion, but noted she was better tolerating exercise since starting Breo. (*Id.*) Lungs were clear on examination. (*Id.*) In July 2018, Rastetter reported difficulty maintaining her COPD due to hot and humid weather. (Tr. 697) She also reported shortness of breath and using her rescue inhaler at least three times a day. (*Id.*) Her examination revealed no abnormalities. (*Id.*) Refills for inhalers and steroids were provided. (*Id.*) At a three month follow up in October 2018, Rastetter stated that her COPD was okay, but exacerbated by the hot humid weather. (Tr. 694) In November 2018, Rastetter reported that her COPD was doing well as long as she took Breo. (Tr. 691)

Rastetter returned to NP Frischkorn for a three month follow up in February 2019 and reported experiencing some flare ups with recent weather changes and expressed that she did not feel her Breo was working as well as it did before. (Tr. 688) Rastetter was instructed to stop Breo and start Symbicort. (*Id.*) In March 2019, it was reported that Rastetter's COPD was stable and both lungs were clear to auscultation. (Tr. 686) In May 2019, Rastetter reported a COPD flare up causing shortness of breath with exertion, possibly due to allergies. (Tr. 684) An examination revealed

3

diminished breathing sounds in the lungs. (*Id.*) Ventolin and Symbicort were refilled with NP Frischkorn noting "continue on meds, stable currently." (*Id.*) NP Frischkorn also administered a steroid injection (Kenalog) due to seasonal allergies aggravating Rastetter's COPD. (Tr. 684-85) In August 2019, Rastetter reported doing well with no shortness of breath and her oxygen saturation was recorded at 99%. (Tr. 682) However, Rastetter needed an alternative to Symbicort because her insurance no longer covered it and her lungs exhibited diminished breathing sounds throughout. (*Id.*) It was noted she failed Breo, but NP Frischkorn prescribed Dulera to take along with Breo. (Tr. 682-83) In September 2019, Rastetter presented to the ER due to a COPD flare up attributed to humidity and her house being bombed for fleas. (Tr. 572) On examination, her lungs were clear with no wheezes, rhonchi, or rales and no respiratory distress. (Tr. 573) X-rays showed no acute infiltrates or abnormalities and she felt better after using a nebulizer. (*Id.*) It was noted she had not used her albuterol inhaler that day and did not have it with her. (*Id.*)

The record is devoid of any treatment for Rastetter's COPD between September 2019 and May 2021. However, in September 2020 she underwent a disability pulmonary function study performed by consultative examiner Bilal Mahmood, M.D. The study revealed normal spirometry, including normal FEV1, forced capacity, and ratio. (Tr. 659-68) At the time of the study, Rastetter reported no breathing difficulties. (Tr. 664) She acknowledged smoking a half pack of cigarettes daily and reported daily activities of cooking, housework, shopping, and caring for pets. (Tr. 648)

In May 2021, Rastetter returned to NP Frischkorn for a refill of Breo. (Tr. 676) Rastetter reported that her COPD was stable until she ran out of inhalers. (*Id.*) Her lungs exhibited diminished breathing sounds; her oxygen saturation was 99%. (*Id.*) In an appointment later that month, Rastetter demonstrated an oxygen saturation of 97%; denied shortness of breath; and her lungs were clear to auscultation. (Tr. 672-73) She was continued on her current course of treatment. (Tr. 673)

4

*Bilateral Knee Pain*

In October 2018, Rastetter complained to NP Frischkorn of bilateral knee pain worse with weight bearing. (Tr. 694) X-rays revealed osteoarthritis in both knees. (Tr. 692) She was referred to a knee surgeon. (*Id.*) In March 2019, Rastetter underwent left total knee arthroplasty with Dr. Stalling. (Tr. 684, 718) Two months later, Rastetter reported doing well. (*Id.*) Three months post-surgery, it was noted that Rastetter was "very satisfied with the outcome." (Tr. 257) Dr. Stalling also affirmed the left knee surgery had an "excellent outcome." (*Id.*) However, after reviewing an MRI, it was decided to move forward with surgery on Rastetter's right knee. (Tr. 258)

On July 31, 2019, Rastetter underwent a right knee replacement without complications. (Tr. 259, 682) Less than two weeks later, Rastetter reported feeling better overall. (Tr. 682) Nonetheless, she was still using a four-pronged cane following her knee surgery. (*Id.*)

At the September 2020, disability pulmonary function study with Dr. Mahmood, Rastetter was able to rise from a squatted position, a sitting position, and from an exam table without any problems. (Tr. 650) Rastetter also performed all walking tests without issue and could hop on one foot. (*Id.*) She had no clubbing, cyanosis, or edema in her extremities. (Tr. 649) She also demonstrated a steady and symmetric gait, used no assistive device, and her Romberg balance test was negative. (Tr. 650)  Aside from the September 2020 functional study, there is no indication that Rastetter treated for her bilateral knee pain between August 2019 to her May 2021 hearing.

## C.    Opinion Evidence

**NP Frischkorn 2020**: On February 11, 2020, NP Frischkorn completed a physical assessment on behalf of Rastetter. (Tr. 644-45). She indicated a diagnosis of COPD, and stated that side  effects of Rastetter's medications include shortness of breath, tachycardia, and tachypnea. (Tr. 644) NP Frischkorn opined that Rastetter could walk less than one block without rest; would require

2-3 unscheduled breaks of 15 minutes duration each in the course of an eight-hour workday; could sit for 8 hours total, and stand/walk for 2 hours total in an eight-hour workday. (Tr. 644) She further opined Rastetter could frequently lift/carry less than 10 pounds; and occasionally lift/carry 10-20 pounds; and is likely to be absent from work once or twice a month due to her COPD. (Tr. 644-45)

**Dr. Mahmood 2020:** On September 5, 2020, Rastetter presented for a consultative examination with Bilal Mahmood, M.D. (T 647-56). She alleged disability due to breathing problems. (Tr. 647) She noted that smoking and seasonal allergies exacerbated her symptoms, which she described as shortness of breath, wheezing and coughing, worsened with prolonged activity. (*Id.*) She also relayed a history of knee problems. (*Id.*) Her medications were listed as Breo (1 puff daily) and Albuterol. (*Id.*) She reported smoking a half pack of cigarettes a day and that her typical daily activities consisted of cooking, doing housework, shopping, doing laundry, sweeping, washing the dishes, and caring for pets. (Tr. 648)

On examination, Dr. Mahmood noted wheezing and tachypnea. (Tr. 649) He also noted Rastetter exhibited no edema; had a steady and symmetric gait; did not use an assistive device; had good hand eye coordination. (Tr. 650) She had a negative bilateral straight leg test and her Romberg sign was negative. (*Id.*) Rastetter was able to lift, carry, and handle light objects; perform fine and gross manipulation; squat and rise with ease; rise from a sitting position and get up/down from exam table with ease; tandem walk normally; and could stand and hop on one foot at a time. (*Id.*)

Dr. Mahmood concluded that Rastetter had no limitations with sitting, standing, or walking; had no significant limitations with lifting or carrying weight; no limitations on bending, stooping, crouching and squatting; no reaching, grasping, handling, fingering, or feeling limitations; and no relevant environmental limitations. (Tr. 651)

6

**State Agency Opinions:**  On September 25, 2020, state agency consultant, Dr. Michael Lehv opined that Rastetter retained the Residual Functional Capacity ("RFC") to stand/walk or sit for 6 hours a day in an 8-hour workday. (Tr. 76) Dr. Lehv further opined that she could frequently kneel, crawl; occasionally use ladders, ropes, or scaffolds due to back pain; could occasionally lift 10 pounds and frequently lift 10 pounds; and should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation and should avoid all exposure to hazards such as heights. (Tr. 75-76)  On reconsideration, Dr. Dimitri Teague affirmed Dr. Lehv's findings. (Tr. 82-84)

## D.    Hearing Testimony

On May 28, 2021, Rastetter, represented by counsel, appeared for a telephonic hearing before an ALJ.  (Tr. 37-71) Rastetter testified to the following:

- She completed schooling through the eleventh grade and did not have a GED after failing the test multiple times. She helps care for her six-year-old grandson who regularly stays with her; she takes care of her own personal care; completes household chores, including caring for a cat; goes shopping; does some cooking; and has a friend drive her when needed. She reported that household chores "takes the heck" out of her and she does them in spurts. She watches TV; reads books; and sometimes fishes. She also smokes cigarettes.

- She stated that she could not work because of her COPD. She treats her COPD with a daily steroid and a rescue inhaler. She stated that in humid weather she used the inhaler 2-3 times a day, but used it infrequently in non-humid weather. She also noted taking steroid tapers at times (i.e., when her COPD worsens her practitioner puts her on a tapered steroid regime). She had an emergency room visit in September 2019 due to COPD complications and was treated with steroids. In response to the ALJ's question, Rastetter expressed that she had not experienced any other exacerbations requiring steroid intervention since September 2019.

- Rastetter stated that she saw Nurse Frischkorn the day before the hearing and once earlier in the month, but had not seen her any other times in 2021. Rastetter stated that she saw Nurse Frischkorn frequently in 2020. The ALJ then noted that the case records contained no 2020 medical records for Frischkorn. The ALJ stated she would leave the record open for two weeks for Rastetter's counsel to submit records.

- When asked if she had other medical issues to discuss, Rastetter exclaimed that she just found out that she has high cholesterol. She also stated that she has extreme anxiety for which she had been taking medication for over the last year. Rastetter

7

testified that her anxiety medication was increased, but it was helpful. However, she noted that at times it was difficult to control her anger.  When asked if Rastetter had any other medical issues to discuss, Ratstetter stated, "No, I'm fine, thank you."

(Tr. 44-64) When Rastetter's counsel asked whether she thought she could stand six hours in an eight-hour day, Rastetter replied that she would not be able to do so because her knees lock up making her lower back hurt and that she had coughing fits when it gets hot and humid outside. (Tr. 64) She testified that her knees often swelled which required her to elevate her legs and that her muscles tense up from cold and rain. (Tr. 65)

A Vocational Expert ("VE") Teresa Trent also testified at the hearing (Tr. 65-70). The ALJ posed three hypothetical scenarios to the VE about whether an individual of Rastetter's age and education could work and, if so, what types of jobs could they perform with the following theoretical limitations:

1. Light work: can frequently climb ramps or stairs, but can never climb ladders, ropes, or scaffolds; frequently stoop, kneel, crouch, or crawl; no more than frequent exposure to humidity, extreme temperatures, poor ventilation or pulmonary irritants such as fumes, odors, dust, or gas; avoid all exposure to workplace hazards such as unprotected heights. (Tr. 66)
   - The VE testified that the hypothetical person in question #1 could perform work as a routing clerk, a marking clerk, and a cleaner. (Tr. 66-67) The ALJ sought clarification as to whether the cleaner job was consistent with the limitation on no more than frequent exposure to pulmonary irritants. The VE stated that although the cleaner job would require some exposure to cleaning chemicals/products, but it would be "at most occasional." (Tr. 67)

2. The ALJ then modified hypothetical #1 by adding that, the person could only stand or walk for up to four hours in an eight-hour workday; could occasionally balance, stoop, kneel, crouch, or crawl. (Tr. 67-68)
   - The VE testified that the cleaner and marking clerk positions would be eliminated as they require standing most of the day; the routing clerk job would remain but with a reduction in numbers; and that jobs as a bench assembler and inspector could be added. (Tr. 68) The VE testified that his answers were consistent with the Dictionary of Occupational Titles ("DOT"), with the exception of his opinion regarding the standing/walking limitation, which was based on the VE's placement experience, education, and training. The VE noted stand/walk limitations were not addressed in the DOT. (*Id.*)

8

3.  The ALJ then asked the VE to keep hypothetical #2 and add that the individual could perform complex tasks, but not at a production rate pace like assembly line work; and can interact frequently with others. (Tr. 69)
    - The VE testified that the jobs identified in response to hypothetical #2 would apply and remain unchanged. (*Id.*)

4.  The ALJ then asked if the VE applied the pace and interaction limitations from the third hypothetical to hypothetical #1, what jobs would remain. (*Id.*)
    - The VE testified that the routing clerk, bench assembler, and inspector jobs remained. (*Id.*)

5.  The ALJ then asked the VE, based on his experience, what percentage of off task time do employers tolerate? And how many unscheduled absences per month are tolerated?
    - The VE stated that anything beyond 10% of the workday for off task time or two days for absences would become work preclusive over a period of time. (Tr. 69-70)

Rastetter's counsel had no questions for the VE. (Tr. 70)

### III.   STANDARD FOR DISABILITY

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of

9

impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since January 24, 2020, the application date (20 CFR 416.971 et seq.).

2. The claimant has the following severe impairments: osteoarthritis of the bilateral knees, status post total knee arthroplasties; chronic obstructive pulmonary disorder; nicotine dependence; and obesity (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: The claimant can frequently climb ramps or stairs, but can never climb ladders, ropes, or scaffolds. She can frequently stoop, kneel, crouch, or crawl. She can work in a setting with no more frequent exposure to humidity, extreme temperatures, poor ventilation, or pulmonary irritants such as fumes, odors, dusts, or gases. She must avoid all exposure to workplace hazards such as unprotected heights.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on May 25, 1969 and was 50 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since January 24, 2020, the date the application was filed (20 CFR 416.920(g)).

(Tr. 22-32)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v.Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to

support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also His v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.Ohio July 9, 2010).

## VI.  ANALYSIS

Rastetter puts forth two assignments of error in her brief. First, she argues that the ALJ erred in assessing the opinion of NP Frischkorn. Second, Rastetter asserts that the ALJ did not take into account her bilateral knee impairment in fashioning the RFC.

### A.  NP Frischkorn's Opinion

In her first assignment of error, Rastetter argues that the ALJ erred in assessing the opinion of her primary care provider, NP Frischkorn. (Doc. No. 7 at 8-12). Rastetter asserts that the ALJ did not build an accurate and logical bridge between the evidence and the ALJ's opinion that NP Frischkorn's opinion lacked consistency and support. (*Id.*)

#### 1.  Legal Standard

Since Rastetter's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c. Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 416.920c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability

program's policies and evidentiary requirements. 20 C.F.R. § 416.920c(a), (c)(1)-(5). However, the

regulations specify that supportability and consistency are the most important factors. 20 C.F.R. §

416.920c(b)(2). With regard to these factors the regulations state:

> The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

## 2.    Analysis

In her assessment of NP Frischkorn's opinion, the ALJ stated the following, in pertinent

part:

> Heather Frischkorn, NP-C completed a physical assessment on behalf of the claimant in February 2020. She stated the claimant had shortness of breath, tachycardia, and tachypnea. She can walk for less than 1 block, sit for 8 hours in an 8-hour workday, and stand/walk for 2 hours of an 8-hour workday. She would require 2-3 unscheduled breaks per 8-hour shift for approximately 15 minutes…She would be absent approximately once or twice a month (Exhibit 4F). The undersigned does not find the opinion persuasive. While NP Frischkorn is an acceptable medical source with a treating relationship with the claimant, the objective findings and conservative treatment recommendations in her own treatment records are not consistent with the level of limitations set forth in her opinion, particularly the limited ability to stand or walk and the necessity of multiple unscheduled breaks in the workday.

(Tr. 30) Rastetter argues that the ALJ's decision should be reversed because the ALJ did not build

an accurate and logical bridge between the evidence and the ALJ's determination that NP

Frischkorn's lacked support and consistency. (Doc. No. 7 at 12)

Supportability

The regulations define supportability as "[t]he extent to which a medical source's opinion is

supported by relevant objective medical evidence and the source's supporting explanation."

14

§416.920c(c)(1); *see also Revisions to Rules*, 82 Fed. Reg. at 5853. Here, the ALJ found that NP Frischkorn's limitations regarding Rastetter's ability to stand or walk and the necessity of multiple unscheduled breaks were unsupported by the objective findings or her conservative treatment.

**Objective Findings.** The ALJ correctly assessed that no objective evidence documented limitations related to Rastetter's knees following her two successful knee surgeries in March and July 2019, respectively. After her left knee surgery in March 2019, Rastetter reported she was "very satisfied with the outcome." (Tr. 28, 257) Dr. Stalling also reported the left knee surgery had an "excellent outcome." (*Id.*) Likewise, on August 12, 2019, less than two weeks after her right knee replacement, Rastetter reported feeling better overall, though she was still using a four-pronged cane at that point. (Tr. 682) From August 13, 2019 to her May 2021 hearing Rastetter did not treat for her bilateral knee pain. There is no evidence in NP Frischkorn's treatment notes or elsewhere in the record, of any objective testing done following Rastetter's two successful knee surgeries. Thus, when NP Frischkorn wrote her opinion in February 2020 there was no post-surgical objective evidence to support any stand/walk limitations related to Rastetter's knee pain. In fact, NP Frischkorn fails to mention knee pain in her opinion, she only mentions COPD. (Tr. 644)  Dr. Mahmood's functional exam later that year also demonstrated normal results, including the ability to rise, squat, heel to toe walk, tandem walk, and stand or hope on one foot at a time. (Tr. 647-51)

Objective testing relating to Rastetter's COPD also fails to support NP Frischkorn's stand/walk and break limitations. In March 2018, Rastetter's oxygen saturation went down after six-minute walk test, however, that test was conducted on Rastetter's first visit establishing care with NP Frischkorn and prior to a medication regime established by NP Frischkorn. (Tr. 27, 702) April 2018 pulmonary function tests "did not reveal any abnormalities," (though Frischkorn questioned whether use of steroids and antibiotics may have skewed the test results) and Rastetter's

lungs were clear to auscultation. (Tr. 27, 34, 699) In July 2018, Rastetter reported difficulty maintaining her COPD due to recent hot and humid weather, however, the examination revealed no abnormalities. (Tr. 27, 697) In March 2019, it was reported that Rastetter's COPD was stable and both lungs were clear to auscultation. (Tr. 28, 686) In May 2019, Rastetter had diminished breathing sounds and reported shortness of breath, it was noted that seasonal allergies caused a COPD flare and she was given a Kenalog injection for seasonal allergic rhinitis. (Tr. 28, 684) In August 2019, Rastetter again had diminished breath sounds, but reported doing well with no shortness of breath and her oxygen saturation was recorded at 99%. (Tr. 28, 682) In September 2019, Rastetter presented to the ER due to a COPD flare up. Treatment notes suggested the flare up was due to flea bombing at her home with humidity also a possibility for the aggravation of symptoms. (Tr. 28-29, 572) She demonstrated diffuse decreased breath sounds, but her lungs were clear with no wheezes, rhonchi, or rales, and no respiratory distress. (*Id.*) X-rays showed no acute infiltrates or abnormalities. (*Id.*)  In May 2021, Rastetter returned to NP Frischkorn for a medication refill, reporting that her COPD was stable until she ran out of inhalers. (Tr. 676) On exam, her lungs exhibited diminished breathing sounds, but her oxygen saturation was 99%. (*Id.*) In an appointment later that month, Rastetter demonstrated an oxygen saturation of 97%; denied shortness of breath; and her lungs were clear to auscultation. (Tr. 672-73) Thus, the objective testing largely revealed normal results. *Harrier v. Berryhill*, No. 1:17-CV-01163-JAY, 2019 WL 12758078, at *5 (W.D. Tenn. Mar. 21, 2019) ("A lack of supporting objective evidence is a significant factor that the ALJ may consider when evaluating any medical opinion."); *McLearren v. Astrue*, No. 2:06-0071, 2009 WL 703294, at *10 (M.D. Tenn. Mar. 16, 2009) (found substantial evidence to support discounting opinion, including "lack of objective medical evidence in [provider's] treatment notes to support his conclusion.")

Accordingly, the ALJ's determination that objective evidence failed to support NP Frischkorn's opinion was supported by substantial evidence.

**Conservative Treatment.** The ALJ also found that NP Frischkorn's conservative treatment failed to support to her opined limitations. NP Frischkorn's treatment of Rastetter's COPD consisted of prescribed medication, smoking cessation, weight loss, and exercise. *Blaim v. Comm'r of Soc. Sec.,* 595 F. App'x 496, 499 (6th Cir. 2014) ("the mildness of [claimant's] treatment-mostly pain medication, weight loss, and exercise-suggested that his ailments were comparatively mild."); *see also Masters v. Comm'r of Soc. Sec.*, 707 Fed.Appx. 374, 380 (6th Cir. 2017) (finding the ALJ properly considered multiple factors, including conservative treatment, when assessing the medical evidence); *Lester v. Comm'r of Soc. Sec.,* 596 Fed.Appx. 387, 389 (6th Cir. 2015) (considering conservative treatment when weighing medical source statements); *Denniston v. Comm'r of Soc. Sec.,* No. 3:20-CV-01467-JGC, 2021 WL 8342843, at *19 (N.D. Ohio Sept. 1, 2021) (finding claimant's conservative COPD medication treatment, albeit with several exacerbations, was "not consistent with the severity of symptoms the claimant has alleged.") Notably, Rastetter's medication regime also remained mostly stable throughout the period. In fact, even after a large gap in treatment no changes were made to her COPD prescription regimen. (Tr. 673)

Rastetter's lack of treatment also supported the ALJ's determination that only conservative treatments were necessary. The ALJ considered that the record was devoid of any treatment for Rastetter's COPD with NP Frischkorn from September 2019[1] to the time of NP Frischkorn's opinion in February 2020. *Offord v. v. Comm'r of Soc. Sec.*, No. 5:21-2257, 2022 WL 2717026, at *14 (N.D. Ohio July 13, 2022) (ALJ reasonably considered a long gap in treatment in rejecting a medical source opinion). Notably, even when Rastetter returned to treatment over a year after her

---

[1] At the September 2019 ER visit, it was noted Rastetter had not used her albuterol medication that day. (Tr. 28-29, 572)

last visit with NP Frischkorn, the examination yielded normal results and her COPD was described as "fairly stable." (Tr. 29, 673) NP Frischkorn made no changes to Rastetter's COPD medication regime. (*Id.*) Thus, substantial evidence supports the ALJ's determination that conservative and sporadic treatments failed to support NP Frischkorn's opinion.

Rastetter contends that the ALJ erred because she made no reference to any specific objective medical evidence or treatment notes in her analysis of NP Frischkorn's opinion. However, Rastetter's arguments would require this Court to read only the paragraph directly addressing NP Frischkorn's opinion and ignore the rest of the ALJ's decision, which cannot be done. This Court has regularly upheld an ALJ's analysis of the supportability and consistency of a medical opinion by looking at the ALJ's opinion as a whole. *See e.g., Crum v. Comm'r of Soc. Sec.,* 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time …it suffices that she listed them elsewhere in her opinion."); *White v. Comm'r of Soc. Sec.,* No. 1:21-CV-00864-JDG, 2022 WL 2105977, at *11 (N.D. Ohio June 10, 2022) ("Reading the opinion as a whole, it is evident to the Court the ALJ rejected Dr. Saghafi's lifting and standing/walking limitations on the basis of conflicting evidence..."); *Taylor v. Kijakazi*, No. 1:20-CV-01121, 2021 WL 4477865, at *9 (N.D. Ohio Sept. 30, 2021) (upholding ALJ's analysis of medical opinion by looking at record as a whole); *Alexander v. Kijakazi*, No. 1:20-CV-01549, 2021 WL 4459700, at *12 (N.D. Ohio Sept. 29, 2021) ("[T]he decision as a whole sufficiently explains why nurse Murphy's opinions were found to be lacking in consistency.") Looking at the decision as a whole, as this Court must do, the ALJ's determination that NP Frischkorn's opinion lacked support is supported by substantial evidence in the record.

Consistency

18

Rastetter also argues that the ALJ erred by failing to discuss the consistency factor. (Doc. No. 7 at 12). First, as explained in the prior paragraph, the ALJ's opinion must be reviewed as a whole. Therefore, the ALJ was not required to address all conflicting evidence in the paragraph addressing NP Frischkorn's opinion as Rastetter suggests. Further, an ALJ "need not necessarily use the words 'supportability' or 'consistency,' as long as the ALJ still performs the requisite analysis of these factors," and a reviewing court is able to follow the ALJ's reasoning. *Hannahs v. Comm'r of Soc. Sec.,* No. 3:20-1905, 2021 WL 8342817, at *11 (N.D. Ohio Dec. 15, 2021).

As a whole, the ALJ's opinion identified evidence that was inconsistent with NP Frischkorn's opinion. Dr. Mahmood's September 2020 opinion and examination conflicted with NP Frischkorn's opinion. During the examination, Rastetter was able to complete all functional testing without any recorded difficulty including squatting, rising, standing, walking, and hopping on one foot. (Tr. 30, 650) Dr. Mahmood opined that Rastetter had no sitting, standing, or walking limitations. (Tr. 30, 651)[2] The opinions of both State agency consultants also contradicted NP Frischkorn's opinion. (Tr. 30) The ALJ also noted that Rastetter performed typical activities of daily living such as cleaning, housework, shopping, doing laundry, sweeping, washing dishes, and caring for her pets. (Tr. 29) The ALJ also considered Rastetter's large gap in treatment as being in conflict with the severity of the allegations alleged. Thus, the ALJ's decision identified substantial evidence in the record that conflicted with NP Frischkorn's opined limitations.

As Rastetter notes, the consistency factors apply to evidence from *other* medical sources and nonmedical sources. 20 C.F.R. § 416.920c(c)(2); *see also Revisions to Rules*, 82 Fed. Reg. at

---

[2] The ALJ determined that the record as a whole supported the addition of some exertional, climbing, postural, and environmental limitations. Thus, she adopted most, but not all, of Dr. Mahmood's findings. (Tr. 30) However, the ALJ need not adopt every opinion expressed by a medical expert even when finding their opinion holds great weight. *Schulte v. Colvin,* 4:13-CV-01521, 2014 WL 1654129 at *5 (N.D. Ohio Apr. 24, 2014) ("an ALJ is not required to adopt every opinion expressed by a non-examining medical expert, even when an ALJ overall accords that opinion great weight"). The ALJ explained, given Rastetter's full history, she found greater limitations than Dr. Mahmood.

19

5853. Here, evidence from the other medical sources conflicted with NP Frischkorn's opinion. As to nonmedical sources, Rastetter points to her own subjective complaints as being consistent with NP Frischkorn's opinion. However, the ALJ found Rastetter's statements concerning the intensity, persistence, and limiting effects of her symptoms were "inconsistent" and "not substantially supported by the medical evidence." (Tr. 26) Rastetter does not challenge the ALJ's credibility determination. And, thus, the ALJ's credibility determination stands. Further, the undersigned notes that Rastetter's own testimony confirms that she has not experienced any COPD exacerbations requiring steroid intervention since September 2019. (Tr. 51)

> Summation – Supportability and Consistency

The ALJ's determination that NP Frischkorn's opinion lacked support and consistency, is supported by substantial evidence. The Court cannot reweigh evidence at this stage. *See Smith v. Chatter*, 99 F.3d 781 (6th Cir. 1996); *see also Delbo v. Comm'r of Soc. Sec.,* No. 1:21-CV-01522, 2022 WL 2530709, at *13 (N.D. Ohio Jul. 7, 2022) (" The fact that [plaintiff] would weigh the evidence differently or that there is record evidence that may support a more restrictive RFC do not serve as grounds for reversal." ); *Harrod v. Comm'r of Soc. Sec.*, No. 3:17CV1839, 2018 WL 3869897, at *16 (N.D. Ohio Aug. 15, 2018), *report and recommendation adopted* (" Although Plaintiff clearly believes the ALJ should have assessed more restrictive limitations based on her interpretation of the medical record, that belief does not establish a violation of the substantial evidence standard." ). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir.2001) (citation omitted). Since the ALJ's determination to discount NP Frischkorn's opinion is supported by substantial evidence, it must be upheld.

**B.  Bilateral Knee Impairment**

In her second assignment of error, Rastetter argues that the ALJ's RFC determination is not supported by substantial evidence because it failed to properly take into account her bilateral knee impairment. (Doc. No. 7 at 14-15) Rastetter asserts her bilateral knee impairment is more limiting than determined by the ALJ, and that the ALJ failed to explain the reasons for rejecting the more severe stand/walk limitations opined by NP Frischkorn. (Doc. No. 7 at 14-15) The Commissioner asserts that Rastetter's argument is unavailing because she only "points to evidence pre-dating her successful knee surgeries." (Doc. No. 8 at 7) The Commissioner also contends that substantial evidence supports that the RFC accounted for Rastetter's knee impairment. (*Id.*)

### 1. Legal Standard

A social security disability claimant's RFC is an assessment of the most a claimant can still do despite her limitations. 20 C.F.R. § 404.1545(a)(1). In making this determination, the ALJ must consider all relevant evidence in the case record. *Id.;* Social Security Ruling [SSR] 96–8, 1996 WL 374184, at *5. This evidence includes medical records, opinions of treating physicians, and the claimant's own description of his limitations. 20 C.F.R. § 404.1545(a)(3).

### 2. Analysis

In determining Rastetter's RFC, the ALJ considered Rastetter's testimony and considered the opinion of NP Frischkorn that Rastetter could only stand/walk for 2 hours in an 8-hour workday. (Tr. 26, 30, 644) However, the ALJ determined that Rastetter's allegations and Frischkorn's opinion were not consistent with substantial evidence in the record. (Tr. 26, 30) Rastetter has not challenged the ALJ's credibility determination. Further, as detailed in the prior section, the ALJ did not err in the handling of Frischkorn's opinion.

Also, substantial evidence exists in the record to support the ALJ's RFC determination regarding Rastetter's bilateral knee impairment. The record contains no evidence of treatment for

Rastetter's bilateral knee pain for nearly two years (August 2019-May 2021). (Tr. 29; Doc. No. 7 at 6). Both SSA regulations and caselaw support an ALJ discounting a claimant's allegations for failing to seek treatment. *Moore v. Comm'r of Soc. Sec.,* 573 F. App'x 540, 543 (6th Cir. 2014) (finding claimant's "failure to pursue treatment greatly erodes her credibility); *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004) ("[W]hen a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment. A failure to do so may cast doubt on a claimant's assertions of disabling pain.")

In addition to lack of treatment for an extended period, the treatment records fail to document evidence of any knee related limitations following Rastetter's surgeries in March and July of 2019. Before Rastetter's break in treatment for her knee pain from August 2019-May 2021, evidence showed that both knee surgeries had gone well. (Tr. 257, 682) At a September 2019 ER visit for a COPD exacerbation, Rastetter had normal gait, range of motion, and sensation in her legs along with no swelling and no calf tenderness. (Tr. 28-29, 573) When Rastetter returned to treatment with NP Frischkorn in May 2021, there was no mention of knee pain. (Tr. 29, 676-77) Moreover, Rastetter exhibited no functional deficits during her 2020 consultative examination. (Tr. 29, 649-50). Rastetter was able to rise, walk, hop on one foot. (Tr. 650) She had a steady gait, no swelling, and did not use an assistive device. (Tr. 649-50)  Aside from the visit where she was still using a cane less than two weeks post-surgery, Rastetter fails to point to any treatment records for her bilateral knee pain following her successful surgeries. The only post-surgical evidence Rastetter relies on in support of her claim for further limitations related to her knees is her hearing testimony that she did not believe she could stand or walk for six hours a day because her knees "lock up;" and that she gets swelling in her knees, and needs to elevate her legs for most of the day. (Doc. No. 7 at 15, citing Tr. 64) As noted earlier, the ALJ found Rastetter's complaints unsupported by the

record and Rastetter has not challenged the ALJ's credibility determination. Moreover, the record evidence discussed above conflicts with Rastetter's allegations.

The decision demonstrates that the ALJ considered and took account all symptoms related to Rastetter's knee pain that the ALJ determined were credible and supported by the record. For example, although Rastetter completed all functional tasks without deficit in the consultative exam with Dr. Mahmood, the ALJ determined Dr. Mahmood's recommendation for no physical limitations did not fully account for Rastetter's history of osteoarthritis and knee surgery. (Tr. 30) The ALJ accounted for these issues in the exertional, climbing, and postural limitations in the RFC. In particular, the ALJ limited Rastetter to light work with the following limitations: frequently climb ramps or stairs, but never climb ladders, ropes, or scaffolds; frequently stoop, kneel, crouch, or crawl; and had to avoid all workplace hazards such as unprotected heights. (Tr. 25) The ALJ also relied on two state agency medical opinions to support her RFC determination. Both state agency consultants opined that Rastetter could perform light work with the following limitations: frequently climb ramps or stairs, but never climb ladders, ropes, or scaffolds; frequently stoop, kneel, crouch, or crawl; and had to avoid all workplace hazards such as unprotected heights. (*Id.*)

Though Rastetter's testimony provides evidence in support of greater limitations, the undersigned is not permitted to reweigh evidence, only to determine whether substantial evidence supports the ALJ's determination. The Court must defer to an ALJ's findings if they are supported by substantial evidence, even if substantial evidence also supports the opposite conclusion. *Lindsley v. Comm'r of Soc. Sec.,* 560 F.3d 601, 604-05 (6th Cir. 2009); *see also O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (*quoting Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)) ("the Commissioner's decision still cannot be overturned so long as substantial evidence also supports the conclusion reached by the ALJ.") Here, the ALJ considered and accounted for Rastetter's bilateral knee pain in the RFC. The ALJ's determination that Rastetter

23

had no further limitations related to her knees is supported by substantial evidence including the success of Rastetter's knee surgeries; the lack of treatment for Rastetter's knees following the surgeries; treatment notes from a 2019 ER visit and a May 2021 visit with NP Frischkorn; Dr. Mahmood's examination results; and two state agency consultation opinions. Thus, Rastetter fails to show that the ALJ erred in consideration of her bilateral knee pain in the RFC.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be **AFFIRMED**.


Date:  May 24, 2023                                          _s/ Jonathan Greenberg_
                                                             Jonathan D. Greenberg
                                                             United States Magistrate Judge


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  _Berkshire v. Beauvais_, 928 F.3d 520, 530-31 (6th Cir. 2019).**